FILED

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

99 SEP 30  PM 3: 40

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| DR. LAURIE BRAGA, DR. JOSEPH BRAGA, DEBRA ABRAMS, STEVE ABRAMS, MARGARET BETH ABRAMS, ROBERT DAVIS, | } } } } } | |
| Plaintiffs, | } } | |
| v. | } } | CASE NO. CV 97-B-1657-S |
| PIZITZ REALTY COMPANY, | } } | |
| Defendant. | } } | |

ENTERED

SEP 3 0 1999

### MEMORANDUM OPINION

Currently before the court is the Motion for Summary Judgment filed by defendant Pizitz Realty Company ("Pizitz Realty" or the "Company"). Plaintiffs Laurie Braga, Joseph Braga, Debra Abrams, Steve Abrams, Margaret Beth Abrams, and Robert Davis (collectively, the "Smolian Family Shareholders")[1] brought this suit seeking compensatory damages for breach of contract and declaratory relief.[2] Upon consideration of the record, the submissions of the parties,

---

[1] The December 30, 1986 Agreement Respecting Pizitz Realty Company states: "The term 'Smolian Family Shareholders' means Mrs. Bertha Smolian, Dr. Arthur M. Pruce, Dr. Laura Braga, Dr. Joseph Braga, Ms. Debra Pruce Abrams and Mr. Robert S. Davis, any spouse or lineal descendant, or parent or grandparent thereof." (Compl. at Ex. A at 1 [hereinafter Agreement].) Richard A. Pizitz, Sr., vice-president of Pizitz Realty, agrees that the plaintiffs are the surviving Smolian Family Shareholders, as defined by the Agreement. (Pizitz Aff. ¶ 2.) Accordingly, all references in the Agreement to "Smolian Family Shareholders" pertain to the plaintiffs in the present case and the court will thus refer to the plaintiffs as the Smolian Family Shareholders.

[2] It is undisputed that the Smolian Family Shareholders are citizens of Florida, Pizitz Realty is an Alabama corporation with its principal place of business in Alabama, and the amount in controversy exceeds $75,000. Therefore, the court has subject matter jurisdiction by virtue of diversity jurisdiction. See 28 U.S.C. § 1332.

-1-



the argument of counsel, and the relevant law, the court is of the opinion that the defendant's motion is due to be denied.

## I. FACTUAL BACKGROUND

Pizitz Realty is a "closely-held family corporation" in the business of real estate management. (Laurie Braga Aff. ¶ 2.) Members of the "Pizitz family" own a majority interest in Pizitz Realty while members of the "Smolian family" own a minority interest. (*Id.* at ¶¶ 2, 7.) On December 30, 1986, the Smolian Family Shareholders, along with other shareholders of Pizitz Realty, entered into the Agreement Respecting Pizitz Realty Company. (*See* Compl. at Ex. A at 1 [hereinafter Agreement].) Drafted by counsel for the Smolian Family Shareholders, the Agreement states its purpose to "assure that all the shareholders of Pizitz Realty Company shall be treated equitably and fairly, and that the rights of the minority holders shall be respected." (Agreement at 1; *see also* Laurie Braga Aff. ¶ 8.) The present dispute arose from the following "put" option contained in the Agreement:

> As of January 1, 1992, and through December 31, 1996, any shareholder who is a member of the Smolian Family Shareholders may demand . . . that the Company purchase all or any part of his or her stock in the Company for an amount equal to, . . . in the case of common stock, . . . its per share Fair Market Value . . . as of the date of such demand . . . .

(Agreement at § 1(h)(ii).) The Agreement provides, as follows, for the determination of "Fair Market Value":

> The Fair Market Value of all the outstanding stock of the Company shall be (a) as mutually determined by the Company and the persons electing to require the Company to purchase their stock or, absent such an agreement, (b) the amount, determined by two independent appraisers, one selected by the Company and the other selected by the persons electing to require the Company to purchase their shares. In the event such two appraisers do not agree on an amount, then such two appraisers shall appoint a third independent appraiser who shall

determine such fair market value and whose determination shall be final and binding on the parties. . . . In lieu of purchasing such stock at its fair market value, the Company may, instead, immediately commence proceedings toward its complete liquidation and dissolution.

(*Id.* at § 1(h)(iv).)

Pursuant to the Agreement, Joseph Braga exercised his put option on December 22, 1995, demanding that Pizitz Realty purchase all 800 shares of his common stock. (Pizitz Aff. ¶ 3, Ex. B.) On February 22, 1996, Pizitz Realty responded with an offer of $31.73 per share based upon an accounting firm's assessment. (Casey Aff. ¶ 4, Ex. B.) Pizitz Realty's offer letter also contained the following disclaimer:

> The foregoing offer by the Company to purchase Joseph Braga's Shares shall in no manner be deemed or construed to obligate the Company to purchase the Common Stock held by any other "Smolian Shareholder" . . . nor be deemed or construed as a waiver by Company of any of its rights under the Shareholders Agreement with respect to any additional redemption demand by any Smolian Shareholder, including, without limitation, the Company's right pursuant to the last sentence of Section 1(h)(iv) of the Shareholders Agreement to "immediately commence proceedings toward its complete liquidation and dissolution" in lieu of purchasing any stock at its Fair Market Value.

(Casey Aff. at Ex. B.) Richard A. Pizitz, Sr., vice-president of Pizitz Realty and a member of the Board of Directors, asserts that the Company followed this course of action because the Agreement "contemplates that the Company and the shareholder first attempt to reach a mutual agreement to a value for the shares, and in an effort to avoid the expenses of formal appraisers." (Pizitz Aff. ¶ 4.)

After requesting and receiving various financial documents, Joseph Braga ultimately rejected the Company's offer on July 22, 1996. (Casey Aff. at Exs. C to G.) He requested that the parties proceed with the appraisal process pursuant to section 1(h)(iv)(b) of the Agreement.

(*Id.* at Ex. G.) Pizitz Realty subsequently retained Norman Pless on October 10, 1996 and received his appraisal on December 10, 1996. (Pizitz Aff. ¶ 6.) In January 1997, Joseph Braga and the Smolian Family Shareholders retained H.J. Porter & Associates. (Casey Aff. ¶¶ 12-17, Exs. I-L.) H.J. Porter & Associates rendered its appraisal on April 1, 1997. (*Id.* at Ex. R; Pizitz Aff. ¶ 6.) The parties exchanged appraisals shortly thereafter. (Casey Aff. ¶¶ 25-26, Ex. R.)

Meanwhile, on December 12, 1996, the Smolian Family Shareholders (besides Joseph Braga) demanded that Pizitz Realty purchase their 41,620 shares of common stock. (*Id.* Aff. at Ex. M.) This decision to exercise their put options was "based upon the fact that our put option would expire at the end of December, 1996." (Laurie Braga Aff. ¶ 10.) At the time, neither the Smolian Family Shareholders nor the Company had any knowledge that a prospective buyer was interested in one of the company's real estate assets. (Casey Aff. ¶ 19.)

On March 10, 1997, Pizitz Realty entered a contract to sell its One Court Square property in Montgomery, Alabama, which comprised over 80 percent of the Company's assets. (*Id.* ¶ 20, Ex. N; Pizitz Aff. ¶ 9, Exs. H, I.) In a letter dated March 15, 1997, the Company's accounting firm advised that the cash received from the upcoming property sale should be distributed to the stockholders as a "liquidating distribution" instead of an "ordinary dividend" because of tax advantages associated with liquidating distributions. (Casey Aff. ¶ 22, Ex. O.) Richard A. Pizitz, Sr. forwarded the accountant's recommendation to the Company's general counsel, Richard A. Pizitz, Jr., with the suggestion that counsel for the Smolian Family Shareholders be sent a copy "for his concurrence and we can then take appropriate Board action." (*Id.*) The Smolian Family Shareholders were subsequently notified of the possibility of a liquidating distribution. (*Id.*)

On March 25, 1997, Richard A. Pizitz, Jr. wrote another letter to counsel for the Smolian Family Shareholders proposing liquidation of the Company:

> In order to permit the long term capital gain treatment for these distributions and subsequent distributions, the Company must have previously adopted a plan of liquidation. Certainly, in light of the pending sale of the One Court Square property in Montgomery . . . which represents 80% to 85% of the Company's total assets, it seems appropriate that the Board of Directors adopt a plan of liquidation for the Company.

(*Id.* at ¶ 23, Ex. P.) On March 31, 1997, Joseph and Laurie Braga notified Pizitz Realty that "they do not agree that the 1996 dividend be treated as a liquidating distribution, and they do not agree with any plan of liquidation for the company." (*Id.* at ¶ 24, Ex. Q.)

The shareholders of Pizitz Realty unanimously approved the sale of the One Court Square property on April 14, 1997. (*Id.* Aff. ¶ 27, Ex. S; Pizitz Aff. ¶ 9.) On the same day, the Board of Directors adopted a plan to liquidate the Company. (Pizitz Aff. ¶ 10, Ex. I.) On April 28, 1997, the Company made another offer to the Smolian Family Shareholders for purchase of their stock. (Casey Aff. ¶ 28.) According to counsel for the Smolian Family Shareholders, this offer eventually led to a disagreement concerning the valuation of the Montgomery property. The Company argued that the value of the property should be reduced by its liquidation costs while the Smolian Family Shareholders responded that the property should be valued at its fair market value in December 1996 when the Smolian Family Shareholders exercised its put options. (*Id.* at ¶ 31.) When the Company stated that it may dissolve instead of accepting the higher valuation, the Smolian Family Shareholders allegedly "reminded counsel for the company that it had waived its rights to dissolve in lieu of the puts by electing to proceed with the process and not immediately commencing dissolution proceedings." (*Id.*)

On May 16, 1997, the shareholders of Pizitz Realty voted to dissolve the Company, pursuant to section 1(h)(iv) of the Agreement. (Pizitz Aff. ¶ 12, Ex. K.) On June 3, 1997, Pizitz Realty sent official notice of the decision to the Smolian Family Shareholders who responded by disputing the Company's right to dissolve in lieu of purchasing the plaintiffs' shares. (Casey Aff. ¶¶ 32-33, Exs. X, Y.) At the time this lawsuit was filed, Pizitz Realty had not purchased any stock from any member of the Smolian Family Shareholders. (Laurie Braga Aff. ¶ 11.)

## II. SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255.

## III. DISCUSSION

"Summary judgment is appropriate in a breach of contract action where the contract is unambiguous and the facts undisputed." *P&S Bus., Inc. v. South Cent. Bell Tel. Co.*, 466 So. 2d 928, 931 (Ala. 1985). "However, if terms within a contract are ambiguous in any respect, the determination of the true meaning of the contract is a question of fact to be resolved by a jury."

*McDonald v. U.S. Die Casting & Dev. Co.*, 585 So. 2d 853, 855 (Ala. 1995) (citing *Dill v. Blakeney*, 568 So. 2d 774 (Ala. 1990)). "Determining whether a contract is ambiguous is a question of law for the trial judge to decide." *Id.* at 931; *accord ERA Commander Realty, Inc. v. Harrigan*, 514 So. 2d 1329, 1334 (Ala. 1987). Because the present Agreement is ambiguous, the defendant's Motion for Summary Judgment is due to be denied.

A contract is ambiguous if "the contract is reasonably susceptible to more than one meaning." *Akins v. Randolph County Bd. of Educ.*, 643 So. 2d 995, 997 (Ala. Civ. App. 1994) (citing *Vainrib v. Downey*, 565 So. 2d 647 (Ala. Civ. App. 1990)). The present dispute centers on the following portion of the Agreement:

> The Fair Market Value of all the outstanding stock of the Company shall be (a) as mutually determined by the Company and the persons electing to require the Company to purchase their stock or, absent such an agreement, (b) the amount, determined by two independent appraisers, one selected by the Company and the other selected by the persons electing to require the Company to purchase their shares. In the event such two appraisers do not agree on an amount, then such two appraisers shall appoint a third independent appraiser who shall determine such fair market value and whose determination shall be final and binding on the parties. . . . *In lieu of purchasing such stock at its fair market value, the Company may, instead, immediately commence proceedings toward its complete liquidation and dissolution.*

(*Id.* at § 1(h)(iv) (emphasis added).) A fair reading of the Agreement yields at least two reasonable interpretations of this contract provision. Thus, the Agreement is ambiguous.

The defendant argues that "the Agreement permitted the Company to await the completion of the appraisal procedures . . . before making its decision." (Def.'s Mot. ¶ 6.) To support this position, the defendant points to language in the Agreement offering the Company "complete liquidation and dissolution" as an alternative to "purchasing such stock at its *fair market value.*" (*See* Agreement § 1(h)(iv) (emphasis added).) Because the Agreement uses the

term "fair market value" in presenting the Company's options, one might reasonably conclude that the Company is permitted to make its choice *after* fair market value is determined. This interpretation is also reasonable from an economic perspective: the rational economic actor wants to know what costs and benefits it foregoes when it chooses one option over others. Faced with the choice of liquidating or purchasing the plaintiffs' stock, Pizitz Realty would want to know how much the plaintiffs' stock would cost the company *before* it chose the drastic option of dissolving itself. Though perfectly reasonable, the defendant's interpretation is not the only reasonable interpretation of the Agreement.

The plaintiffs assert that the Company's options are entirely exclusive of one another. That is, Pizitz Realty must choose at the outset whether to liquidate or purchase the plaintiffs' shares *before* it begins the process of determining fair market value; one choice forecloses the other. This interpretation is also reasonable considering the appreciable time and expense involved with the appraisal process prescribed by the Agreement. To illustrate, the parties in the present case elected to commence the appraisal process on July 22, 1996. (Casey Aff. ¶ 10, Ex. G.) The appraiser chosen by the plaintiff was retained on January 16, 1997 for a fee of $16,500. (*Id.* at ¶ 16, Ex. K.) The parties did not exchange appraisals until April 1, 1997. (*Id.* at ¶¶ 25-26, Ex. R.) Because the two appraisals differed (*see id.* at ¶ 31), a third appraisal would have been necessary (*see* Agreement at § 1(h)(iv)). The time and money consumed by the appraisal process represent the transaction costs of redeeming the Smolian Family Shareholders' stock. If allowed to liquidate, Pizitz Realty will incur additional liquidation costs. By forcing the defendant to make its decision at the outset, the plaintiffs' interpretation of the Agreement is economically rational because it minimizes transaction costs: the Company would either incur the transaction

costs of liquidating or the transaction costs of purchasing the plaintiffs' stock, but not both.

The plaintiffs also assert that the Agreement's use of the word "immediately" in section 1(h)(iv) means Pizitz Realty must *instantaneously* decide whether to liquidate or purchase stock once a Smolian Family Shareholder exercises the put option. The plaintiffs correctly note that words in a contract are to be given their "ordinary meaning." *See Loerch v. National Bank of Commerce of Birmingham*, 624 So. 2d 552, 553 (Ala. 1993). Likewise, the court will "not strain to interpret a contract provision that is free from ambiguity, nor [will the court] insert ambiguities into an otherwise unambiguous provision by twisting its construction." *Shirley v. Lin*, 548 So.2d 1329, 1332 (Ala. 1989). Nevertheless, in the context of the agreement, "immediately" cannot reasonably mean "instantaneously." Requiring a corporation to undertake instantaneous decision-making is virtually impossible because a corporate decision, by definition, is a collective decision. Moreover, to act in the best interests of the shareholders and to honor their fiduciary obligations, the Board of Directors must be given reasonable time to make their decisions. The Alabama Supreme Court has held that "immediately" means "within a reasonable time." *See, e.g., Haston v. Transamerica Ins. Servs.*, 662 So. 2d. 1138, 1141 (Ala. 1995) (insurance contract); *Liberty Mut. Ins. Co. v. Bob Roberts & Co.*, 357 So. 2d 968, 970 (Ala. 1978) (insurance contract). The court finds this construction is appropriate in the present case. Thus, "immediately," as used in the present Agreement, must mean "within a reasonable time" or "as soon as possible."

## IV. CONCLUSION

Because the Agreement gives rise to at least two reasonable interpretations, the court concludes that the Agreement is ambiguous and genuine issues of material fact exist in the

present case. Therefore, the defendant's Motion for Summary Judgment is due to be denied. An order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 30th day of September, 1999.

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge